UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAMIAN BLACK,

                Petitioner,

                                                    CASE NO. 04-CV-70926-DT
v.                                      HONORABLE ARTHUR J. TARNOW

THOMAS BIRKETT,

                Respondent.
_____/

## OPINION AND ORDER DENYING PETITION
## FOR WRIT OF HABEAS CORPUS[1]

**I.**      **Introduction**

      Michigan prisoner Damian Black ("Petitioner") has filed a *pro se* petition for writ

of habeas corpus pursuant to 28 U.S.C. § 2254 asserting that he is being held in violation

of his constitutional rights.  Petitioner is currently confined at the Standish Maximum

Correctional Facility in Standish, Michigan.  Petitioner was convicted of second-degree

murder and possession of a firearm during the commission of a felony following a bench

trial in the Wayne County Circuit Court in 1997.  He was sentenced to consecutive terms

of 23 to 50 years imprisonment and two years imprisonment.  In his pleadings, Petitioner

raises claims concerning the voluntariness of his jury trial waiver, the effectiveness of

trial and appellate counsel, witness intimidation, and sentencing proportionality.  For the

reasons set forth below, the Court denies the petition for writ of habeas corpus.

---

[1]Staff Attorney Cheryl Takacs Bell provided quality research assistance.

Black v. Birkett
04-CV-70926-DT
Page 2

## II.    Facts

Petitioner's convictions arise from the shooting death of Admonichus Ingram in

Detroit, Michigan on April 24, 1996.  Petitioner was charged with first-degree murder and

possession of a firearm during the commission of a felony.  Prior to trial, he waived his

right to a jury trial.  The following colloquy occurred:

> THE CLERK:  Mr. Black has filed a waiver of trial by jury and requests a waiver trial before this Court.
>
> * * *
>
> THE COURT:  Sir, you understand you have an absolute trial by jury and you're going to waive that right and be tried by the Court?
>
> DEFENDANT BLACK:  Yes.
>
> THE COURT:  Nobody forced you to make that decision?
>
> DEFENDANT BLACK:  No, your Honor.
>
> THE COURT:  And you made that decision after discussing it with your lawyer, right?
>
> DEFENDANT BLACK:  Yes.
>
> THE COURT:  People consent?
>
> MR. WAGNER:  Yes, your Honor.
>
> THE COURT:  The waiver is accepted as voluntarily made.

Trial Tr., 11/24/97 Vol. I, pp. 3-4.  The case proceeded to trial before Wayne County

Circuit Court Judge Harvey F. Tennen.

2

Black v. Birkett
04-CV-70926-DT
Page 3

At trial, several witnesses identified Petitioner as the perpetrator of the shooting.

Petitioner asserted an alibi defense.  The trial court summarized the testimony as follows:

Admonichus Leonus Ingram was pronounced dead at Henry Ford Hospital on the 24th day of April, 1996.  Upon an exam being made of the body, Dr. Carl J. Schmidt, medical examiner of Wayne County, his conclusion was that Mr. Ingram died of multiple gunshot wounds of the back, abdomen, right buttock, right arm and both legs.... The manner of death was homicide.

...Tamika Harvey, testified that she had known the defendant, she identified the defendant as her former boyfriend and...she was pregnant on the date of the incident with the child of the defendant.

She had no arguments with the defendant as of that date.  At approximately 11:30 p.m. on that evening of April 23rd, the defendant came to her house and he was with her until this incident occurred, approximately 2:00 the next day, the 24th.

Other people came to her house about midnight.  She described them as Digum, Tino, Will, and J.L.  Toby, her sister, was also there....

At 1:30... Admonichus Leonus Ingram and Leslie Crenshaw came over together.  When they walked in, the defendant went to the back porch, came back and there was conversation about a cigar and shortly thereafter, Damiam Black leaves with Will, Tino and J.L.....

She talked of an incident two years ago – that allegedly occurred between this defendant and Leonus Ingram and Digum, that there was a robbery of Leonus.  Anyway, at this date on the early morning of April 24th, '96 she was in the bedroom of her sister.  Then Toby goes on the porch with Leonus and Leslie Crenshaw.  And is saying good-bye to them.  This is after the defendant and the other three parties left.  It was about 2:00 in the morning.

She goes back into the bedroom, she hears a car alarm and gunshots.  She hears more than five or ten gunshots.  She looks outside the front window which she describes as being about ten feet away, 15 feet away from the

Black v. Birkett
04-CV-70926-DT
Page 4

parked vehicle... that being this Escort.

She sees and identifies the defendant, Black, standing over Leonus who is
our decedent and she says the defendant is putting another clip into a gun
and shooting twice and running.  She says there's a light in front of the
house, a street light and that's been confirmed by several other witnesses.
The house next door is a vacant home.  She estimates this entire action was
15 to 20 feet away from her in the front window.

She did not tell the police.  She said she was not home.  She says she was
scared.  And she described Tino as having a dark hooded sweat shirt and the
person with the dark hooded sweat shirt is described as being outside when
the shots are going off.  She had no phone so she did not call the police
from her house.

She gave two statements.  One she said she wasn't home.  The second
statement she does give which essentially is what her testimony is.

...there was really no altercation in the house....

.... She saw just one person shooting outside and that was the defendant and
she saw the decedent lying there and apparently running some short
distance away after he was shot.

She indicated that she had talked to her mother about what she had seen and
the mother called the police....  The mother told her to tell the truth.  She
then went back to the police the next day and told the statement....

Toby Harvey is the sister of Tamika.  She identifies the defendant as
somebody she knows but she's never had any problem with.  So there's no
animosity here between any of the parties.  The only indication is
something that may have occurred two years ago.  It had nothing to do with
the girls.

She testifies 11:30, 12:00 the defendant came over alone, no problems.
Three additional men came to visit.  She talks about J.L., Will and Tino.
Tino had a blue hooded sweat shirt on.  Leonus, the decedent and Leslie

4

Black v. Birkett
04-CV-70926-DT
Page 5

Crenshaw come over later so she more or less confirms what her sister had testified to.  Black was in the front room.  She talks about the cigar which was asked for and given.

Defendant leaves and the three others leave and she testified she's on the porch with Leonus and Leslie about a half hour before they left.  They talked about death and funerals and things of that nature....

She heard the car alarm, she heard the shooting, five or six shots.  She went to the front window and she saw two people, Damian Black standing over Leonus on the ground.  Mr. Black puts another clip and shoots more shots.  There's a light near her house by the vacant house.  She says she's about ten feet away.  The car is right outside the window....

She took the kids and ran to her mother's house.  Called the police on a pay phone and then went back to the house.  She has nothing against the defendant.  She knows Leslie Crenshaw.  She knows his writing.  She was presented with Defendant's Exhibit A and she said it was not Crenshaw's writing.

They talked about a person by the name of Buckshot.... she knows him from long ago, but not very well.  She admitted that ...weed was sold out of the house at one time, but not on that night.  The defendant and Leonus did not argue at the house....

Rhonda Ingram, the mother of the decedent testified that she identified her son down at Ford Hospital that morning.  He was known as Lee or Leonus and she testified that Leslie Crenshaw came to the hospital....

The medical reports were stipulated to....

Leslie Crenshaw testified he knew the decedent, Ingram, who was his friend....Mr. Crenshaw talks about being in the County Jail....

...[Crenshaw] went to a cousin's house then he went to Tamika Harvey's house at about 2:00 with Ingram.  Mr. Black is there and the other guys who [were] previously described.  He identifies the defendant.  He knew of him.

This is the first time he's seen him.  He had no problems with him, he really didn't know him that well.  But he did know of him and he doesn't really tell how he knows of him.

He was there for five minutes.  There was a guy with a hood at the door. He talked about the light, certain kind of cigar and he talked about the fact that Leonus had an incident with the defendant before, but nobody really goes into any detail on that.

He...goes to the back room.  Defendant leaves.  [Crenshaw] stayed for five minutes.  Leonus talks about dying and a funeral on the front porch.  The car is near the porch.  The street light is on.  He's getting into the passenger side and Leonus is walking around.  He is halfway in the car and Leonus is getting into the car and shots are heard on the street coming from across the street.  He ran to the side of the house and tried to hide and he looked across the street and saw the defendant and the guy with the black hood.  Both had guns, both were shooting.  He says the defendant says catch him, we've got to get rid of him.  Crenshaw thought that meant him, the guy with the black sweat shirt continues on between the houses....

He says there's lots of shots [and he hides].  Leonus is lying there moaning. [They] had no guns.  Defendant Black stands over Leonus and shoots him. He left and he ran away and called his mother.  He went to the hospital to help identify Leonus and be with the family.  I think he testified that Tamika and Toby Harvey went to the hospital with him.

Defendant's Exhibit A which is the letter that allegedly he wrote to Buckshot. [Crenshaw] says he never wrote a letter, he doesn't know Buckshot that well except he knows of him.  The prison number is not his prison number but a case number.  But he denies ever writing Buckshot because he says he really doesn't know him.

His credibility was attacked by the fact that he had a previous robbery armed as a juvenile.  He's 21 years old now.  He testified that Tamika and Toby took him to the hospital a half an hour later.  No exact time.  He saw the mother at the hospital.  He talks about Ebony with the Escort....

He says he gave a statement to police with his mother.  And he made the statement on the 25th of the month, a day later.

He was cross-examined about what he talked about at the hospital.  He insisted he didn't talk about the killing but ...that he was consoling the family.  He did not talk about the killing.

On redirect he indicated that he thought Buckshot was a friend of the defendant, Mr. Black.  He had seen them together previously.

Sergeant William Stevenson testified that he investigated the homicide about 3:00 a.m. the night of the 24th.  At that time, the body was gone already.  The car was in the yard....

When he's there, there's nobody else there....  He finds approximately 15 casings in the street.  And his testimony is that he felt Leonus was shot while he was on the ground.  He finds the car with both doors open....

He finds no shots between the houses, but he finds blood between the houses, 20 feet from the car.  He talked to several neighbors, they heard gunshots and went back to bed.  They saw nothing outside.

Carmen Diaz, a police officer, went to the scene.  She was probably the first officer on the scene with her partners.  She found the vehicle with two doors open.  She found the body next to the house ....

There was blood next to the house between the houses.  There is a street light ...on the same side as this house was.... There was some issue of whether there were drugs on that street....  She interviewed Tamika Harvey.  She said she was gone all day and somebody had called her that somebody was shot by her house.

She had heard that the car that was there, the Escort, was a stolen vehicle.  Ebony was seen driving it for some period before this time....

There was a stipulation as to the Crime Lab's findings.  That indicated that the decedent died of close range firing and... the medical exam indicates

that he died of multiple gunshots to several parts of his body.

\* \* \*

Mary Alexander testified that after 1:00 on the 24th ... Stefanie called....her daughter, Patti Jones, to take Damian to the hospital because the baby is ill....she thought Stefanie was at the hospital, she didn't know for sure. [She] thought it was the 24th but she...wasn't sure.

\* \* \*

Stefanie Dixon testified that she is Damian's girlfriend and mother of his child that was born....  She has five kids with him.  At 3:56 a.m. on April 23rd she gave birth to a son, Deante at Ford Hospital.  She says that on April 24th, '96 at 1:00 a.m., the baby was taken to ICU and at that time, she called Damian's mother's house and told him to come and take the baby to ICU.  She says this occurred 1:00 a.m. on April 24th.

She... spoke to Patti on the phone to bring Damian down.  She says he was in the hospital at 2:30 and he left with the baby to go to ICU.

She further testified that she left the hospital on the 24th on that same day, in the afternoon without the baby and with her mother....  She talks about these complications and that is how the defendant came to the hospital at that time and place....  She says... that he had left sometime in the morning, the defendant, that he went to New York to visit his grandmother also on the 24th at night.  She was ill in New York.

Patti Jones Alexander, a friend of Ms. Dixon, ... testifies [that on] April 24th, '96 she... picked up the defendant at 2:15 and took him to Henry Ford Hospital....

She didn't give a statement until 1997, one and a half years after the occurrence....  She saw the defendant in 1997 in Fort Wayne, Indiana where she... had moved when Stefanie moved there...in July of '96....

The fact is, she admits that she's a good friend of Stefanie Dixon....

The medical records of Ford Hospital were finally delivered yesterday.

That's what held this case up....  The Court has reviewed some of those
records....

Aubrey Stanley otherwise known as Buckshot testified that he got a letter
from Crenshaw.  He has known Crenshaw for four years.  He's known
Leonus for four years. He says he had conversation with Crenshaw
regarding the death of Leonus.  He saw him in Court on November 10th,
before the letter.

His testimony was to the effect that he knows the defendant did not do it....
He's doing time for robbery of a bank.  And he seemed to talk about Leslie
stealing six kilos and he seems to put the robbery on somebody dealing with
drugs.  But not the defendant.

He knows Tamika and Toby.  He's been in jail since January of '96 ... for
bank robbery, receiving and concealing stolen property so he was actually
in jail when this event occurred in April of '96.  He was locked up and he
couldn't see Leslie before that date before the letter.  He doesn't really
know anything prior to the 10th of November....

Damian Black was advised of his right that he didn't have to testify and he
chose to testify on his own behalf.  He testified that on April 24th, the time
of the alleged murder, he was not at the scene.  Tamika does not have his
child.  His only wife is Stefanie Dixon and he stayed at his mother's house.
He testified about Stefanie's phone call on the night in question.  He says
that the...baby was born in the early a.m. on the 23rd and he talks about the
phone call being either late on the 23rd in the p.m. or early the 24th.

Patti brought him down.  He walked to the front desk.  He says Patti didn't
go in, she just dropped him off.  He says at 2:15 he's upstairs [until]...
Stefanie and the baby were discharged.  Her mother picked [them] up.  His
testimony is that he was there until the baby and mother were picked up by
her mother the next morning.  That is contrary to what Stefanie testified to
and it's also – it conflicts with the hospital records.  They show the baby
wasn't discharged until April 26th.

He says he went to New York the same day at about 10:00 p.m. to visit his

grandmother and take care of her.  He stayed there for many months.  She had surgery on her back and he was there two or three months to help her heal her back.  He was back in Detroit for a couple days to visit his mother and then he went to Fort Wayne, Indiana so he knew where Stefanie was at all times.  He went there – he wanted to be there [until] his son started school.  Then he was going back to New York for three or four months.

He testified he gave himself up to the FBI.  He didn't know Leonus and didn't shoot Leonus.  He's never been in trouble before.

On cross-examination he again reiterated that he stayed at the hospital [until] both parties were discharged, the mother and the son.  And that Stefanie's mother came with the car and he went home with her....

He turned himself in in Indiana.  Didn't know Ingram, the decedent, or Crenshaw.

Trial Tr., 12/2/97 Vol. V, pp. 3-19.

At the close of testimony, the trial court found Petitioner guilty of second-degree murder and felony firearm.  The court subsequently sentenced him to consecutive terms of 23 to 50 years imprisonment and two years imprisonment on those convictions.

## III.    Procedural History

Following sentencing, Petitioner, through counsel, filed an appeal as of right with the Michigan Court of Appeals challenging the proportionality of his sentence.  The Michigan Court of Appeals affirmed Petitioner's sentence.  *People v. Black*, No. 210029, 2000 WL 33521020 (Mich. Ct. App. March 31, 2000) (unpublished).  Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was denied.

*People v. Black*, 463 Mich. 918, 619 N.W.2d 544 (2000).

Petitioner also filed a motion for relief from judgment in the trial court asserting several claims of error, including those contained in the present petition.  The trial court denied the motion, finding that the claims lacked merit and that Petitioner had failed to show good cause for not raising the issues on direct appeal under Michigan Court Rule 6.508(D)(3).  *People v. Black*, No. 98-004704 (Wayne Co. Cir. Ct. Aug. 19, 2002).  Petitioner then filed an application for leave to appeal with the Michigan Court of Appeals, which was denied for failure to "meet the burden of establishing entitlement to relief under MCR 6.508(D)."  *People v. Black*, No. 246304 (Mich. Ct. App. July 3, 2003) (unpublished).  Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was similarly denied.  *People v. Black*, 469 Mich. 988, 673 N.W.2d 758 (2003).

Petitioner signed the present petition for writ of habeas corpus on March 1, 2004, asserting the following claims as grounds for relief:

I. His convictions and sentence must be reversed where the trial court failed to properly secure a waiver of his Sixth Amendment right to a jury trial by failing to address him in open court about whether he was voluntarily waiving his right to a jury trial as prescribed by MCR 6.402(B).

II. He was denied his Sixth Amendment right to the effective assistance of counsel where trial counsel failed to adequately prepare to present the alibi defense.

III.    The trial court and Aubrey Stanley's appointed counsel deprived him of his Sixth Amendment right to a fair trial and to have a witness testify on his behalf by intimidating and persuading Aubrey Stanley not to testify by mis-informing him that he could be charged with perjury and sentenced to the same sentence as first-degree murder if he testified untruthfully.

IV.    He was denied his Sixth Amendment right to the effective assistance of counsel when trial counsel told the court during closing arguments that "a not guilty verdict" would be unfair.

V.    The trial court abused the principle of proportionality by imposing a sentence of 23 to 50 years imprisonment under the facts and circumstances of this case.

VI.    He was denied his right to the effective assistance of counsel on appeal where substitute appellate counsel failed to present any claims of trial errors or errors by prior appellate counsel.

Respondent filed an answer to the petition on August 26, 2004 contending that the claims

should be denied for lack of merit and/or based upon procedural default.

## IV.   Standard of Review

Federal law imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in

the State court proceedings.

28 U.S.C. § 2254(d).  Additionally, this Court must presume the correctness of state court

factual determinations.  28 U.S.C. § 2254(e)(1).

## V.      Analysis

### A.      Procedural Default

As an initial matter, Respondent contends that Petitioner's jury trial waiver,

ineffective assistance of counsel, and witness intimidation claims are barred by

procedural default.  Petitioner contends that any procedural default should be excused due

to the ineffectiveness of appellate counsel.

Procedural default is not a jurisdictional bar to a review of the merits of a habeas

petition.  *See Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005) (citing *Trest v.*

*Cain*, 522 U.S. 87, 89 (1997)).  Consequently, a federal court is not required to address a

procedural default issue before ruling against a habeas petitioner on the merits of his

claims.  When a procedural default issue presents a more complicated question and is

unnecessary to the disposition of the case, a court may proceed directly to the merits of

the petitioner's claims in the interest of judicial economy.  *See Lambrix v. Singleterry*,

520 U.S. 518, 525 (1997); *Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003);

*Johnson v. Warren*, 344 F. Supp. 2d 1081, 1089 (E.D. Mich. 2004); *see also Strickler v.*

*Green*, 527 U.S. 263, 282 (1999) (considering merits of habeas claims where such inquiry

mirrored procedural default cause and prejudice inquiry); *see also Cameron v. Birkett*, 348 F. Supp. 2d 825, 836 (E.D. Mich. 2004) (same).

In the present case, resolving the procedural default issue will be more complex than deciding the substantive claims on habeas review and will require some consideration of the merits of those claims. Accordingly, in the interests of judicial economy, the Court will address the merits of Petitioner's habeas claims without ruling on the procedural default issue.

**B.      Jury Trial Waiver (Habeas Claim I)**

Petitioner first asserts that he is entitled to habeas relief because the trial court failed to ensure a proper waiver of his right to a jury trial waiver under state law. In *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275 (1942), the United States Supreme Court held that "an accused, in the exercise of a free and intelligent choice, and with the considered approval of the court, may waive trial by jury." A criminal defendant may waive trial by jury if four conditions are met. First, the waiver must be in writing. Second, the government attorney must consent to the waiver. Third, the trial court must approve the waiver. Fourth, the waiver must be voluntary, knowing, and intelligent. *United States v. Martin*, 704 F.2d 267, 271 (6th Cir. 1983). There is no constitutional requirement that a court conduct a complex colloquy with a defendant prior to a proper waiver of a jury trial. *Id.* at 275 (declining to adopt mandatory supervisory rules

requiring trial courts to personally interrogate defendants before accepting jury trial

waivers); *Jackson v. Burt*, 877 F. Supp. 389, 393 (E.D. Mich. 1995), *aff'd.*, 99 F.3d 1139

(6th Cir. 1996).  Moreover, Petitioner has the burden of showing that his waiver was not

personally, intelligently, voluntarily, and knowingly made.  *See Adams*, 317 U.S. at 281;

*Jackson*, 877 F. Supp. at 393.

      In this case, Petitioner's claim that his waiver was improper is belied by the record.

The record reveals that Petitioner signed a jury trial waiver form, that he acknowledged

that he had a right to a jury trial, that he had consulted with counsel about his rights, and

that he wished to waive his right to a jury trial.  *See* Trial Tr., 11/24/97 Vol. I, pp. 3-4.

Petitioner has not shown that the waiver was executed other than by his own free will.  He

does not allege that he was coerced, threatened, promised leniency, or otherwise

improperly induced to provide the waiver.  He has thus failed to establish that his jury

trial waiver was involuntary.

      Furthermore, to the extent that Petitioner alleges that the trial court erred under

Michigan law, he fails to state a claim for habeas relief.  It is well-settled that federal

habeas relief may only be granted to an individual who is "in custody in violation of the

Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  This Court's

power to grant a writ of habeas corpus only extends to errors in the application of federal

law.  *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Federal habeas relief may

not be granted based upon a perceived error of state law.  Habeas relief is therefore not

warranted on this claim.

### C.    Ineffective Assistance of Trial Counsel (Habeas Claims II and IV)

Petitioner also asserts that he is entitled to habeas relief because trial counsel was

ineffective for failing to properly prepare to present his alibi defense and for stating

during closing arguments that "a not guilty verdict" would be unfair.

In *Strickland v. Washington,* 466 U.S. 668 (1984), the United States Supreme

Court set forth a two-pronged test for determining whether a habeas petitioner has

received the ineffective assistance of counsel.  First, a petitioner must  prove that

counsel's performance was deficient.  This requires a showing that counsel made errors

so serious that he or she was not functioning as counsel as guaranteed by the Sixth

Amendment.  466 U.S. at 687.  Second, the petitioner must establish that the deficient

performance prejudiced the defense.  Counsel's errors must have been so serious that they

deprived the petitioner of a fair trial or appeal.  *Id.*

With respect to the performance prong, a petitioner must identify acts that were

"outside the wide range of professionally competent assistance" in order to prove

deficient performance.  *Id.* at 690.  The reviewing court's scrutiny of counsel's

performance is highly deferential.  *Id.* at 689.  The court must recognize that counsel is

strongly presumed to have rendered adequate assistance and made all significant

16

decisions in the exercise of reasonable professional judgment.  *Id.* at 690.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is one that is sufficient to undermine confidence in the outcome.  *Id.*  "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result."  *McQueen v. Scroggy*, 99 F.3d 1302, 1311-12 (6th Cir. 1996) (quoting *Strickland*, 466 U.S. at 686).

As noted, Petitioner first claims that trial counsel was ineffective for failing to obtain his medical records before trial and properly investigate his alibi defense.  The record, however, reveals that counsel made efforts to obtain Petitioner's medical records before and during trial.  The delays in obtaining those records were caused by hospital personnel.  Furthermore, counsel produced those records during trial and presented witnesses and Petitioner's own testimony to support the alibi defense.  Although the medical records did not conclusively establish Petitioner's presence at the hospital during the time of the shooting, they supported Petitioner's alibi in part.  Trial counsel was not ineffective for producing the medical records at trial.  The fact that counsel's strategy was ultimately unsuccessful does not mean that counsel was ineffective.  *See, e.g., Moss v.*

*Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002) ("an ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken").

The medical records and the defense witnesses provided some evidence in support of the alibi defense. Petitioner has not established that counsel failed to take reasonable steps to investigate his alibi defense, nor has he provided exculpatory evidence which counsel should have produced at trial. Conclusory allegations, without evidentiary support, do not provide a basis for habeas relief. *See, e.g., Workman v. Bell*, 160 F.3d 276, 287 (6th Cir. 1998) (conclusory allegations of ineffective assistance of counsel do not justify federal habeas relief); *Zettlemoyer v. Fulcomer,* 923 F.2d 284, 301 (3rd Cir. 1991) (bald assertions and conclusory allegations do not provide sufficient basis to hold an evidentiary hearing in habeas proceedings). The record reveals that counsel took reasonable steps to investigate and present Petitioner's alibi defense such that his performance was not deficient under *Strickland, supra.* Moreover, given the evidence presented at trial, including the eyewitness testimony identifying Petitioner as the shooter, and the fact that Petitioner offers no new additional evidence in support of his alibi defense, Petitioner cannot establish that he was prejudiced by trial counsel's conduct.

Petitioner also claims that trial counsel was ineffective for stating, during closing arguments, that a not guilty verdict would be unfair. This claim lacks merit. Trial

Black v. Birkett
04-CV-70926-DT
Page 19

counsel advocated for a not guilty verdict based upon the evidence presented at trial.

Counsel argued that the evidence presented created a reasonable doubt, which

necessitated a not guilty verdict.  The intent of counsel's "unfairness" comment, when

read in the context of his entire closing argument, was that it was unfair that witnesses

had not testified truthfully so that the true perpetrator of the shooting would be held

accountable.  *See* Trial Tr., 12/1/97 Vol. IV, pp. 22-23.  Petitioner has not shown that trial

counsel's performance was deficient, nor has he shown that he was prejudiced by

counsel's brief comment during closing arguments.  Petitioner is thus not entitled to

habeas relief on his ineffective assistance of trial counsel claims.

### D.     Witness Intimidation (Habeas Claim III)

Petitioner next contends that he is entitled to habeas relief because the trial court

and Aubrey Stanley's attorney improperly intimidated Stanley and persuaded Stanley not

to provide additional and potentially exculpatory testimony at trial.  The United States

Supreme Court has recognized that a criminal defendant's rights to compulsory process

and due process of law may be violated if a witness who is otherwise willing to testify is

effectively coerced into invoking his or her Fifth Amendment privilege against self-

incrimination.  *See Webb v. Texas*, 409 U.S. 95, 97-98 (1972) (per curiam).

In order to establish a *Webb*-type violation, a petitioner "must show that the

contact substantially interfered with any free and unhampered determination the witness

19

might have had as to whether to testify." *United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995); *see also United States v. Emuegbunam*, 268 F.3d 377, 400 (6th Cir. 2001) (no prosecutorial interference with defense witness's decision not to testify when witness's concern about exposure to potential criminal liability motivated his decision, not any threats by government officials); *accord United States v. Hoffman*, 832 F.2d 1299, 1303 (1st Cir. 1987) (defendant must show that conduct of court or prosecutor caused witness not to testify).  In evaluating the coercive impact of perjury or criminal liability warnings, a court must consider the totality of the circumstances, including such factors as the manner in which the issue is raised, the language of the warnings, the basis in the record for believing the witness might lie, and whether the warning indicates an expectation of perjury.  *See United States v. Vavages*, 151 F.3d 1185, 1190 (9th Cir. 1998).

Having reviewed the record, this Court concludes that the trial court's actions (and those of Aubrey Stanley's counsel) did not constitute a *Webb*-type violation of Petitioner's constitutional rights.  The court and counsel merely advised Aubrey Stanley of the possible consequences if he provided additional testimony which either implicated himself in the crime or resulted in the commission of perjury.  *Webb* does not stand for the proposition that merely warning a witness of the consequences of perjury or possible criminal exposure demands reversal or other post-conviction relief.  *See Emuegbunam*, 268 F.3d at 400.  "Judges and prosecutors do not necessarily commit a *Webb* type

violation merely by advising a witness of the possibility that he or she could face

prosecution for perjury if his or her testimony differs from that he or she has given

previously." *Pierce*, 62 F.3d at 832 (quoting *United States v. Smith*, 997 F.2d 674, 680

(10th Cir. 1993)); *see also Hence v. Smith*, 37 F. Supp. 2d 970, 980 (E.D. Mich. 1999)

(neither trial judge nor prosecutor violates a defendant's Sixth and Fourteenth

Amendment rights by informing a witness who wishes to recant earlier statement of the

penalties of perjury and the desirability of consulting with counsel).

Not all cause and effect is coercion.  A trial court has discretion to warn a witness

about the possibility and perils of self-incrimination or perjury.  *United States v. Arthur*,

949 F.2d 211, 215 (6th Cir. 1991); *see also United States v. Smith*, 997 F.2d 674, 680 (10th

Cir. 1993) (judge's comments were within range of discretion given that witness seemed

to be preparing to give testimony contradicting prior statement); *United States v. Davis*,

974 F.2d 182, 188 (D.C. Cir. 1992) (no coercion where defendant's testimony would have

conflicted with his pre-sentence report statements).  An abuse of discretion only occurs

when the court actively encourages a witness not to testify or badgers a witness into

remaining silent.  *Id.*; *see also Webb*, 409 U.S. at 97-98.

In this case, there is no evidence that the trial court engaged in such prohibited

conduct. "The mere advising of one individual of his rights where there is a justifiable

occasion for doing so, does not in turn infringe upon the constitutional rights of another

Black v. Birkett
04-CV-70926-DT
Page 22

even though the election to exercise those rights may deprive the other of a possible

advantage in his defense." *Commonwealth v. DiGiacomo*, 345 A.2d 605, 607 (Penn.

1975). The trial court in this case merely informed Petitioner of the possibility of perjury

charges and the potential consequences of providing false testimony. Contrary to

Petitioner's assertion, the trial court did not err in advising Aubrey Stanley that he could

face a life sentence, albeit a parolable one, if he committed perjury and was prosecuted

for that crime because Petitioner was charged with first-degree murder – a capital offense

under Michigan law. *See* Mich. Comp. L. § 750.422.

Lastly, given that Aubrey Stanley consulted with his own appointed counsel, it is

likely that his decision to withhold further testimony arose out of a concern for his own

culpability and not as a result of the trial court's remarks. *See Emuegbunam*, 268 F.3d at

400-01; *People v. Robbins*, 131 Mich. App. 429, 440, 346 N.W.2d 333 (1984) (no *Webb*

violation where record suggested that victim's decision not to further testify was based

upon accurate appraisal of legal situation following consultation with counsel). Petitioner

has failed to establish a violation of his constitutional rights with respect to Aubrey

Stanley's decision to invoke his Fifth Amendment rights and not provide additional

testimony at trial. Habeas relief is not warranted on this claim.

####    E.        Sentencing Proportionality (Habeas Claim V)

Petitioner asserts that he is entitled to habeas relief because his sentence violates the principle of proportionality.  The Michigan Court of Appeals considered this claim on direct appeal and rejected it, finding that Petitioner's sentence was within the guideline range and presumptively proportionate.  *See Black*, 2000 WL 33521020 at *1.

To the extent that Petitioner asserts that his sentence is disproportionate under state law, *see People v. Milbourn*, 435 Mich. 630, 636, 461 N.W.2d 1 (1990) (sentence must be proportionate to both the offense and the offender), he fails to state a claim for federal habeas relief.  *See Austin v. Jackson*, 231 F.3d 298, 300 (6th Cir. 2000) (citing *Pulley v. Harris*, 465 U.S. 37, 41 (1984)); *Atkins v. Overton*, 843 F. Supp. 258, 260 (E.D. Mich. 1994).  A petitioner has no state-created interest in having the Michigan Sentencing Guidelines applied rigidly in determining his sentence.  *Thomas v. Foltz*, 654 F. Supp. 105, 106-07 (E.D. Mich. 1987).

Petitioner is also not entitled to habeas relief on any claim that his sentence constitutes cruel and unusual punishment under the Eighth Amendment.  The United States Constitution does not require strict proportionality between a crime and its punishment.  *See Harmelin v. Michigan*, 501 U.S. 957, 965 (1991); *United States v. Marks*, 209 F.3d 577, 583 (6th Cir. 2000).  "Consequently, only an extreme disparity between crime and sentence offends the Eighth Amendment."  *Marks*, 209 F.3d at 583.  A sentence that falls within the maximum penalty authorized by statute "generally does not

23

constitute 'cruel and unusual punishment.'"  *Austin*, 213 F.3d at 302 (quoting *United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1995)).  "Federal courts will not engage in a proportionality analysis except in cases where the penalty imposed is death or life in prison without possibility of parole."  *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995).

Petitioner was sentenced to a term of 23 to 50 years imprisonment on the second-degree murder conviction.  As noted by the Michigan Court of Appeals, this sentence was within the guideline range, *see Black*, 2000 WL 33521020 at *1, as well as the statutory maximum.  *See* Mich. Comp. Laws § 750.317.  Accordingly, this Court concludes that the trial court acted within its discretion in imposing Petitioner's sentence and there is no extreme disparity between Petitioner's crime and his sentence so as to offend the Eighth Amendment.  Habeas relief is not warranted on this claim.

## F.    Ineffective Assistance of Appellate Counsel (Habeas Claim VI)

Lastly, Petitioner asserts that appellate counsel was ineffective for failing to raise the foregoing issues (other than the sentencing claim) on direct appeal.  It is well-established that the right to the effective assistance of counsel includes the right to the effective assistance of appellate counsel.  *See Mapes v. Coyle*, 171 F.3d 408, 427-28 (6th Cir. 1999).  Given the Court's conclusion that the foregoing issues are without merit, however, Petitioner cannot establish that he was prejudiced by appellate counsel's

conduct as required by *Strickland, supra*. *See Smith v. Robbins*, 528 U.S. 259, 285-86

(2000). Habeas relief is thus not warranted on this claim.

**VI.    Conclusion**

For the reasons stated, the Court concludes that Petitioner is not entitled to federal

habeas relief on the claims presented in his petition.

Accordingly,

**IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED**.


s/Arthur J. Tarnow_____
Arthur J. Tarnow
United States District Judge

Dated:  June 13, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record
on June 13, 2005, by electronic and/or ordinary mail.

s/Catherine A. Pickles_____
Case Manager